IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ADAM SHIRVINSKI | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:09-cv-896 (AJT/TRJ) |
| | ) |
| UNITED STATES COAST GUARD, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Defendants Booz Allen Hamilton Inc. ("Booz Allen") and the United States Coast Guard ("Coast Guard") have each moved for summary judgment. [Doc. Nos. 176 and 179.] A hearing was held on September 20, 2010, following which this Court took the motions under advisement. Upon consideration of the motions, the oppositions thereto and the arguments of counsel, the Court grants both motions.

## I.     BACKGROUND

This case arises out of conflicts between Plaintiff and Coast Guard military and civilian personnel involved in the Coast Guard's Deepwater Acquisition Program (the "Project") which ultimately led to Plaintiff's removal from the Project.

Plaintiff Adam Shirvinski ("Shirvinski") is a retired Coast Guard Captain. Shirvinski entered into an at-will consulting agreement with Mohawk Information Systems and Consulting, Inc. ("MISC").[1] MISC, in turn, was a subcontractor under an agreement between MISC and SFA, Inc. ("SFA") that supported the Project. Shirvinski's role was to provide advice to the Coast Guard on configuration management ("CM")

---

[1] Shirvinski's Consulting Agreement also refers to arrangements between Shirvinski, MISC and "CAPTAIN JOSEPH F. RYAN, d/b/a THE SKIP'R." [Doc. No. 189-2.] These arrangements, however, are not germane to the issues before this Court.

issues involved in the Project. The period covered by Shirvinski's consulting agreement with MISC was March 1, 2008 through February 28, 2010, which was selected to coincide with effective dates of MISC's subcontract with SFA, although either party could terminate the agreement unilaterally on 30 days notice. [Doc. No. 189-2.] Shirvinski worked primarily from a facility in Rosslyn, Virginia.

The Coast Guard officials who were assigned to manage SFA's contract with the Coast Guard, under which Shirvinski served as a consultant to the Coast Guard, were Lt. Commander Gero, who was the Contracting Officer's Technical Representative ("COTR"), Cheryl Ellis, who was the Contracting Officer ("KO"), and her assistant, Gwendolyn Scott, who was a contract specialist. [Doc. No 181-3, at 28-29.] Based in Portsmouth, Virginia, they were not, in general, substantively involved in Shirvinski's CM related work but rather managed the contract on behalf of the Coast Guard.

Captain Joseph Vojvodich led the "C4ISR" portion of the Project.[2] Commander Richard Fontana served under Captain Vojvodich as deputy project manager, and Lt. Commander James Espino was a senior officer based in Moorestown, New Jersey. Additional Coast Guard personnel who worked on the Project included Lt. Christopher Armstrong, and civilian Coast Guard employee Stephen Hoshowsky, who was the Software Director for C4ISR and worked in Moorestown under Lt. Commander Espino.

Defendant Booz Allen had been hired by the Coast Guard to support the Project, and Booz Allen personnel included Mike Silver, who served as Booz Allen's project manager on the Project and Vik Singh, who was tasked with helping the Coast Guard develop a CM plan for the Project.

---

[2] C4ISR stands for Command, Control, Communications, Computers, Intelligence, Surveillance and Reconnaissance.

2

In March, 2008, Shirvinski began his work on the Project. Issues soon arose over Shirvinski's role and authority, as well as his style and method of interacting with those already working on CM issues. As a result, in the months that followed, working relationships became increasingly strained and tensions escalated between Shirvinski on the one hand, and certain Coast Guard employees, Hoshowsky in particular, and certain Booz Allen employees on the other. For example, on March 13, Singh of Booz Allen complained to Hoshowsky that Shirvinski had told Singh that "[he] need[ed] to direct all enquiries(sic)/information to him because he will be handling everything with respect to CG-933 CM/CCB [CM issues]." Hoshowsky, in turn, complained to Lt. Commander Espino that "no one has said before, that he [Shirvinski] was now "IN CHARGE" of CM, like the email is implying here; remember our conversation that we should/would/could be tasking him vice us working for him." [Doc. No. 191-11.] Beginning in May 2008, Hoshowsky also complained to his superiors that Shirvinski had identified himself in meetings as "the CG-933 CM/QA Division head reporting directly to CAPT V [Vojvodich] ... yet I have no CG-933 Org chart that confirms that." [Doc. No. 191-16.]

Shirvinski's actual work on the Project further roiled the waters. Shortly after he began his work, he criticized in detail the substance of the CM plan that Hoshowsky and Booz Allen had formulated [3] and recommended that Singh of Booz Allen be removed from the Project. In mid-May, Shirvinski complained to Captain Vojvodich that

---

[3] For example, at a meeting on March 24, 2008, with Hoshowsky and in an April 4, 2008, meeting with Captain Vojvodich and Commander Fontana, Shirvinski extensively criticized the CM plan that had been prepared by Hoshowsky and Booz Allen, identifying, according to Shirvinski, "some two dozen major deficiencies which would require major revisions before the plan would comply with USCG requirements." Shirvinski Dec., [Doc. No. 191-3], at ¶¶ 9-10.

Hoshowsky revised the CM plan without consulting him, and provided a list of criticisms of Hoshowsky's CM plan to Commander Fontana.

On May 28, after hearing concerns about Shirvinski from other Coast Guard commands, Commander Fontana instructed Hoshowsky to inform him of any complaints and issues regarding Shirvinski. Lt. Commander Gero also began to hear complaints about Shirvinski, prompting Lt. Commander Gero to instruct Shirvinski not to directly contact personnel at the USCG Command and Control Engineering Center in Portsmouth, Virginia. In early June, after further disputes arose between Shirvinski and certain Coast Guard personnel, Commander Fontana asked Hoshowsky to draft a new job description for Shirvinski, an initial draft of which Singh prepared at Hoshowsky's request. At some point during the summer of 2008, project manager Silver of Booz Allen also asked Booz Allen employees to report any incidents they had with Shirvinski.

Matters came to a head during the first half of August, 2008. On August 6, Singh learned that Shirvinski had scheduled a meeting with Coast Guard officials without Singh's knowledge and so informed Hoshowsky.[4] Later that same day, August 6, Hoshowsky sent an e-mail to several Coast Guard officials, including Captain Vojvodich, Commander Fontana, and Lt. Commander Espino, with a copy to certain Booz Allen employees, including Singh ("the August 6 e-mail"), in which Hoshowsky reviewed Shirvinski's conduct and what he regarded as the disruptive impact that Shirvinski had on the Project. The e-mail made a number of claims concerning Shirvinski's improper conduct since participating in the Project, including that Shirvinski had introduced

---

[4] Upon learning of this meeting, Singh sent an e-mail to Hoshowsky, which ended with "I need to talk to you." [Doc. No. 191-29.] Singh and Hoshowsky spoke shortly thereafter; and according to Singh and Hoshowsky, they agreed to attend the meeting despite the secretive manner in which Shirvinski had arranged it.

4

himself as a "the CG-933 CM/QA Division Head ... at every meeting and telecom I have attended with him" [Doc. No. 191-31], essentially repeating in expanded form a complaint he first made in May 2008, shortly after Shirvinski first became involved in the Project. On August 11, Hoshowsky forwarded a copy of his August 6 e-mail to Lt. Armstrong.

On August 12, Shirvinski attended a meeting with Captain Vojvodich and Lt. Armstrong, both of whom regarded Shirvinski's conduct in that meeting as aggressive and disrespectful. After the meeting, Capt. Vojvodich instructed Lt. Armstrong to look into the possibility of removing Shirvinski from the Project. Thereafter, Armstrong spoke with Hoshowsky and another Commander who had complained to him about Shirvinski. Shortly thereafter, Captain Vojvodich met with Lt. Armstrong and decided that it would be difficult for Shirvinski to continue his work due to reported difficulties with other Coast Guard directorates, and that Shirvinski should no longer support the Project. [Doc. No. 181-3, at 28.] Captain Vojvodich assigned Lt. Armstrong to communicate this view to the appropriate COTR, in this case, Lt. Commander Gero.

On August 13, Lt. Armstrong forwarded the August 6 e-mail to Lt. Commander Gero's deputy, John Killers, who in turn forwarded it to Lt. Commander Gero, who in turn forwarded the e-mail to contract specialist Scott. [Doc. No. 191-37.] Gero, Ellis and Scott subsequently held a meeting to discuss Captain Vojvodich's request that Shirvinski be separated from the Project. Gero Dep., [Doc. No. 191-7] at 70:20-72:14. Scott then informed SFA by e-mail that Shirvinski had breached his contract and requested "corrective action." Among other issues, Scott specifically referred to the allegation

made in the August 6 e-mail that Shirvinski had referred to himself as a "Division Head." Specifically, the e-mail stated:

> It has come to our attention that Adam Shirvinski, a subcontractor on HSCG23-05-F-TTV002 has violated Sections 1.3.3 and 1.3.4 of the Task Order Performance Work Statement on a number of occasions. We have received reports Mr. Shirvinski has improperly introduced himself as the CG-933 CM/QA Division Head and failed to adhere to the task order requirement to properly identify himself as a contractor. Mr. Shirvinski was also advised by the COTR not to contact certain staff members directly but he proceeded to contact employees despite the warning.
>
> We asked that you take corrective action immediately and update us regarding the outcome of this matter. Please contact us if you have any questions. [Doc. No. 177-9.]

Following SFA's receipt of Scott's e-mail, SFA informed the Coast Guard that it would look into the allegations against Shirvinski. [Doc. No. 181-5, at 4.] By letter that same day, SFA informed MISC that Shirvinski would no longer be allowed to work on the Project. [Doc. No. 191-40.] During the evening of August 13, 2008, MISC informed Shirvinski of the Coast Guard's allegations and that "SFA directed MISC to terminate your services" on the Project. [Doc. No. 191-41.]

On August 11, 2009, Shirvinski filed suit against the Coast Guard, Hoshowsky, Booz Allen and Global Strategies Group (North America), Inc., SFA's successor. On October 13, 2009, the United States substituted itself for Hoshowsky, as permitted under the Federal Tort Claims Act, 28 U.S.C. § 2679, ("FTCA"), and this Court dismissed Hoshowsky and Global Strategies Group (North America) as defendants by Order dated December 18, 2009. [Doc. No. 64.] [5] As to Booz Allen, this Court granted Booz Allen's

---

[5] Also on October 13, 2009, the Coast Guard moved to dismiss Shirvinski's initial Complaint, but Shirvinski filed an Amended Complaint and the Coast Guard's motion was dismissed as moot. The Court subsequently granted the Coast Guard's motion to dismiss in their entirety the claims against it in Shirvinski's Amended Complaint because

motion to dismiss Shirvinski's initial Complaint by Order dated October 16, 2009 [Doc. No. 32], but denied Booz Allen's subsequent motion to dismiss Shirvinski's first Amended Complaint by Order dated December 18, 2009 [Doc. No. 64] and Booz Allen answered Shirvinski's Second Amended Complaint on April 12, 2010 [Doc. No. 93]. Following the close of discovery, the Coast Guard and Booz Allen moved for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual

---

Shirvinski had not proceeded administratively as required under the FTCA. [Doc. Nos. 64 and 66.] The Court then granted Shirvinski leave to file a Second Amended Complaint, which alleges a constitutional tort against the Coast Guard, not subject to the administrative exhaustion requirements of the FTCA. The Court denied the Coast Guard's motion to dismiss this constitutional claim alleged in Shirvinski's Second Amended Complaint by Order dated May 7, 2010. [Doc. No. 117.]

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

This Court has jurisdiction pursuant to 28 U.S.C. § 1361 (mandamus), 28 U.S.C. § 1331 (civil actions arising under the Constitution, laws, or treaties of the United States), and 28 U.S.C. § 1367 (supplemental jurisdiction).

## III. ANALYSIS

### A.    Claims Against Booz Allen

Shirvinski has asserted claims against Booz Allen for tortious interference with contract (Count II), tortious interference with prospective economic advantage (Count III), common law conspiracy (Count IV) and business conspiracy in violation of Va. Code § 18.2-499 (Count V). However, there is no evidence that Booz Allen had any interactions with MISC or SFA. Moreover, while there is ample evidence that Shirvinski and Booz Allen employees did not get along or like each other, there is no evidence to establish that Booz Allen either requested that the Coast Guard terminate Shirvinski's involvement in the Project, or participated in the Coast Guard's decision making process that resulted in its sending to SFA allegations of wrongdoing on Shirvinski's part.

The core of Shirvinski's claim against Booz Allen is that while it did not itself

engage in any direct interference with his contractual relationship, it conspired with

Hoshowsky to have Shirvinski fired by disseminating defamatory statements, as

evidenced primarily by the August 6 e-mail. Based on this alleged conspiracy,

Shirvinski claims that Booz Allen is responsible for his termination on August 13, 2008,

since that termination was based, in substantial part, on the defamatory claim made in the

August 6 e-mail, as retransmitted in Scott's e-mail to SFA to take "corrective action" and

SFA's letter to MISC removing Shirvinski from the Project. For these reasons,

Shirvinski argues that summary judgment is inappropriate as to his claims for

interference with contract, interference with prospective advantage, conspiracy and

business conspiracy because there is sufficient evidence to create a genuine issue of

material fact concerning whether Booz Allen participated in the claimed conspiracy to

have him terminated from the Project through defamatory statements and whether the

conspiracy in fact caused him to be removed from the Project. Because all of

Shirvinski's claims, in the end, depend on the viability of his conspiracy claims, the

Court will first consider the sufficiency of the evidence for those claims.

### 1. Common Law and Statutory Conspiracy

Shirvinski alleges both common law conspiracy (Count IV) and statutory

conspiracy under Virginia's business conspiracy statute, Va. Code, § 18.2-499 (Count V).

To establish a viable claim for common law conspiracy, a plaintiff must show (1) an

agreement between two or more persons (2) to accomplish an unlawful purpose or to

accomplish a lawful purpose by unlawful means, which (3) results in damage. *Firestone*

*v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007) (citing *Glass v. Glass*, 228 Va. 39,

47, 321 S.E.2d 69 (1984)). Similarly, in order to substantiate a claim for statutory conspiracy under Virginia law, a plaintiff mush establish, and prove by clear and convincing evidence at trial, "that the conspirators acted with legal malice, that is, proof that the defendant acted intentionally, purposefully, and without lawful justification." *Simmons v. Miller*, 261 Va. 561, 544 S.E.2d 666, 676-77 (2001); *see also DAG Petroleum Suppliers L.L.C. v. BP P.L.C.*, 452 F. Supp. 2d 641, 649-650 (E.D. Va. 2006) ("Where a plaintiff offers no evidence of an agreement ... summary judgment of a business conspiracy claim is proper"), *aff'd* 268 Fed. Appx. 236 (4th Cir. 2008). As with common law conspiracy, the "Virginia Courts have consistently ruled that to recover damages for statutory conspiracy a plaintiff must show that the defendants have combined to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Potomac Valve & Fitting, Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1284 (4th Cir. 1987) (internal punctuation omitted)(quoting *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 402, 337 S.E.2d 744, 748 (1985)).

The record before the Court is sufficient for a fact finder to conclude that Booz Allen and Hoshowsky entered into an agreement to have Shirvinski removed from the Project. For example, documents in the record, when viewed most favorably to Shirvinski, evidence that Hoshowsky and Singh explicitly agreed to obtain Shirvinski's termination. On August 7, the day after the August 6 e-mail, Hoshowsky and Singh attended, via teleconference, the meeting that Shirvinski had attempted to arrange without their knowledge. During the meeting, Hoshowsky separately sent an e-mail to Singh which stated, "We need to have Mr. S fired! He is way out side [sic] of his CM box." In

response, Singh replied with the affirmative, "Ya." [Doc. No. 191-35.] On this evidence, together with the totality of the circumstances, a reasonable jury could find that Booz Allen and the Coast Guard agreed to secure Shirvinski's termination. However, as Shirvinski conceded during oral argument, and implicitly in his briefs, an agreement to have Shirvinski removed from the Project, in and of itself, is not actionable. Indeed, Shirvinski tried to get Booz Allen employee Singh removed from the CM aspects of the Project. Rather, the dispositive question is whether there is sufficient evidence that Booz Allen entered into not just an agreement to have Shirvinski removed from the Project but an agreement to obtain that removal through unlawful means. This Court finds that there is not.

Shirvinski relies principally on the allegedly defamatory August 6 e-mail as the unlawful means that was used to have him removed from the Project. Shirvinski bases his claim that the August 6 e-mail was part of the alleged conspiracy primarily on the contention that Singh of Booz Allen participated in drafting the August 6 e-mail. However, there is no direct evidence that Singh or any other any Booz Allen employee participated in the composition of the August 6 e-mail, or even knew about the fact or substance of the e-mail until Singh received a copy at the same time as the others to whom it was sent. Moreover, there is no evidence in the record that Booz Allen had any further involvement with the dissemination of this e-mail. Rather, the record reflects that Hoshowsky forwarded the August 6 e-mail to Lt. Armstrong and the August 13 re-transmission took place as a result of communications that were initiated by Coast Guard personnel, including Lt. Armstrong. The record does not reflect that Singh was aware of

this activity, much less agreed to use the allegations as the basis for securing Shirvinski's release from the Project. [*See* Doc. No. 191-37; Doc. No. 191-38.]

Nevertheless, Shirvinski claims that the evidence is sufficient to allow a reasonable inference of Booz Allen's complicity in the August 6 e-mail because Hoshowsky and Sigh had communicated on August 6 before Hoshowsky sent the e-mail and Hoshowsky solicited and received Sigh's reaction to the e-mail after it was sent. The communications between Hoshowsky and Singh that are in the record do not allow the necessary inferences to be drawn. The evidence is that Singh's and Hoshowsky's communications on August 6, before Hoshowsky sent the e-mail, was prompted by Singh's learning that Shirvinski had secretly scheduled a meeting and related to their attending the meeting. There is no evidence that they discussed anything about the substance of the August 6 e-mail and it would be pure speculation to infer such a discussion, particularly since the communication that Shirvinski heavily relies on as evidence of the formation of the conspiracy did not occur until August 7, after Hoshowsky sent and Singh first received he August 6 e-mail. Moreover, Hoshowsky's claim in the August 6 e-mail that Shirvinski misidentified himself repeated an accusation that Hoshowsky first made in May, 2008, before any claim of a conspiracy between Hoshowsky and Booz Allen, further undercutting any inference that the August 6 e-mail was part of the alleged conspiracy. Furthermore, while Shirvinski points to evidence of Booz Allen's and Hoshowsky's efforts to collect information about him, there is nothing inherently unlawful about collecting factual information regarding Shirvinski's on-the-job conduct and activities, particularly given the issues that had arisen since his involvement in the Project. In fact, both Singh and Hoshowsky received instructions

from their superiors to report any difficulties Shirvinski was causing. *See Potomac Valve Fitting, Inc.*, 829 F.2d at 1284 (claims for conspiracy fail where written product of alleged conspiracy is in fact lawful). This evidence, which would support the inference that Hoshowsky and Booz Allen were both looking for reasons to have Shirvinski terminated, does not allow a reasonable fact finder also to draw the inference that they agreed to fabricate reasons to have him terminated.[6] In short, the evidence before the Court does not allow a fact finder to conclude without an impermissible level of speculation that Booz Allen entered into an agreement to have Shirvinski removed by circulating defamatory statements.[7] *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888

---

[6] In support of the claimed conspiracy, Shirvinski also points to a motorcycle trip that Silver took with Lt. Armstrong sometime during the spring or summer of 2008. Shirvinski contends that, even though the timing of the trip and topics of discussion are not clear, it is reasonable to infer that the trip occurred in early August, 2008 and "that during this one-on-one five hour drive, Silver enlisted Armstrong in [Booz Allen's] quest to eliminate Shirvinski." [Doc. No. 191, at 10-11.] This contention, however, is entirely speculative.

[7] In the alternative, Shirvinski essentially contends that Booz Allen is liable for conspiracy under a general concerted action theory. [Doc. No. 191, at 28, citing Prosser & Keeton on Torts § 46, at 323 (5th ed 1984) ("All those who in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's acts done for their benefit, are equally liable.") (emphasis added).] However, even this formulation requires a "common plan or design to commit a tortious act," and there is no evidence that Booz Allen shared a common plan or design to commit a tortious act; only at most, to secure Shirvinski's separation from the Project, which is not independently tortious. Further, Shirvinski argues that bilateral agreements are not necessary to prove a business conspiracy under Virginia law. [Doc. No. 191, at 28.] Plaintiff, however, relies on Fourth Circuit case law interpreting Va. Code § 18.2-499(B), which prohibits *attempts* to procure the participation of others in a conspiracy, rather than an actual bilateral conspiracy. *See Va. Vermiculite Ltd. v. W.R. Grace & Co. Conn*, 144 F. Supp. 2d 558, 605 (W.D. Va. 2001), citing *Multi-Chanel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 526, fn 1 (4th Cir. 1997) ("We deal herein only with [the defendant's] civil liability for attempting to procure the participation of the other defendants in a conspiracy pursuant to § 18.2-499(B)."). Shirvinski does not contend that Singh and Booz Allen attempted to recruit third parties to participate in a conspiracy with the requisite intent, but rather contends based on this authority that Booz

(1990) (noting that Rule 56 requires affidavits to set out "specific facts" in order to prevent parties from "replac[ing] conclusory allegations of the complaint…with conclusory allegations of an affidavit"); *Law Enforcement Alliance of Am. v. USA Direct, Inc.*, 56 Fed. Appx. 147, 148 (4th Cir. 2003) (affirming grant of summary judgment, and explaining, "[t]he nonmoving party's evidence … cannot be conclusory statements … cannot be hearsay … and must contain admissible evidence and be based on personal knowledge") (internal punctuation and citations omitted).

## 2. Tortious Interference with Contract

Shirvinski alleges in Count II that Booz Allen tortiously interfered with his contract with MISC. In Virginia, the tort of tortious interference with contract contains the following elements: (1) the existence of a valid contractual relationship; (2) knowledge of the relationship on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship; and (4) resultant damage to the party whose relationship has been disrupted. *Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97, 102 (1985). However, where the contract at issue is terminable at will, as Shirvinski's contract was, Virginia law does not provide a cause of action for tortious interference with contract. *See Duggin v. Adams*, 234 Va. 221, 360 S.E.2d 832, 836 (1987) ("unlike a party to a contract for a definite term, however, an individual's interest in a contract terminable at will is essentially only an expectancy of future economic gain … Thus, the cause of action for interference with contractual rights provides no protection from the mere intentional interference with a contract terminable at will.").

---

Allen is liable for going along with Hoshowsky's statements about Shirvinski without the requisite intent. There is no basis in law or fact for imposing liability on Booz Allen on this basis; and to do so would essentially eliminate the statute's agreement and intent requirements for establishing the statutory conspiracy.

Rather, such claims should be presented as claims for tortious interference with prospective economic advantage. *See Id.*, at 835-836; *see also Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001) (explaining distinctions between the two torts). Therefore, Booz Allen is entitled to judgment as a matter of law on Plaintiff's claim for tortious interference with contract (Count II).

### 3. Tortious Interference with Prospective Economic Advantage

In Count III, Shirvinski alleges that Booz Allen tortiously interfered with his prospective economic advantage. In order to make a valid claim for tortious interference with prospective economic advantage under Virginia law, Plaintiff must: (1) demonstrate the existence of a business relationship or expectancy, with a probability of future economic benefit; (2) demonstrate knowledge of the relationship or expectancy; (3) show that it was reasonably certain absent intentional misconduct, the claimant would have continued in the relationship or realized the expectancy; (4) show that it suffered damages from the interference; and (5) show that the defendant employed improper means to interfere with the prospective advantage. *Commerce Funding Corp.*, 249 F.3d at 213. Under Virginia law, methods may be improper because they are illegal or independently tortious, or "because they violate an established standard of a trade or profession, or involve unethical conduct ... Sharp dealing, overreaching, or unfair competition may also constitute improper methods." *Duggin,*, 360 S.E.2d at 836 (internal citations and punctuation omitted).

For the reasons discussed above concerning the alleged conspiracy, the record does not support a finding that Booz Allen caused Shirvinski's termination through illegal or independently tortious conduct. There is also no evidence that Booz Allen was

involved in the Coast Guard's decision to report Shirvinski's alleged conduct to SFA, SFA's decision to remove Shirvinski from the Project, or MISC's relationship with Shirvinski, or that Booz Allen had any contact with SFA or MISC. The record is therefore inadequate to support a claim of tortious interference with Shirvinski's prospective economic advantage. Further, absent a viable conspiracy claim, even knowledge by Booz Allen that the Coast Guard circulated false statements about Shirvinski would not provide an adequate basis for an interference claim against Booz Allen because that knowledge is not a substitute for contact between Booz Allen and SFA or MISC. *See 17th Street Assocs., LLP v. Market Int's Ins. Co.*, 373 F. Supp. 2d 584, 601 (E.D. Va. 2005) ("contact by defendant with the source of plaintiff's business expectancy, direct or indirect, is a de facto prima facie element of a claim for tortious interference with a business expectancy."); *see also Cominelli v. Rector & Visitors of the Univ. of Va.*, 589 F. Supp. 2d 706, 716-717 (W.D. Va. 2008) (holding even publication of information with knowledge that its contents might be shared with third parties is not the form of indirect contact required to make a prima facie case for intentional interference).[8]

---

[8] *Krantz v. Air Line Pilots Ass'n, Int'l*, 245 Va. 202, 427 S.E.2d 326 (1993), on which Shirvinski relies, is inapposite. In *Krantz*, the Court considered whether the alleged conduct at issue involved sufficient contacts with Virginia for the Virginia courts to assert jurisdiction. There, the Court found that the defendant's use of an electronic bulletin board system, located in Herndon, Virginia, to send complaints about a pilot to United Airlines, constituted "an act ... in this Commonwealth" within the meaning of Virginia's long-arm statute. *Id.* at 206. Further, *Krantz* is distinguishable because, in that case, the defendant specifically urged others to contact United Airlines and to submit adverse comments about the plaintiff to United Airlines. *Id.* at 204-5. Here, however, there are no indications that Singh had a hand in instigating the preparation of the allegedly derogatory statements at issue in the August 6 e-mail, or instigating the re-transmission of the statements on August 13, which the record indicates occurred through the actions of Coast Guard officials.

Finally, Plaintiff contends that he had a valid business expectancy in continuing to work on the Project beyond the end of MSIC's subcontract on August 15, 2008. In this regard, Shirvinski claims, based on the testimony of Commander Fontana, that the Coast Guard "contemplated keeping him on the Project." [*See* Doc. No. 191, at 26-27.] The testimony, even as summarized by Shirvinski, does not provide the requisite certainty required to establish a business expectancy.[9] *See Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 228 (4th Cir. 2004) (explaining "mere proof of plaintiff's belief and hope that a business relationship will continue is inadequate to sustain a cause of action" and that plaintiffs "must establish [an objective] *probability* of future economic benefit, not a mere possibility."). As to this issue, Shirvinski admits that the Coast Guard never guaranteed that he would be able to work for them "in any capacity for any period of time," and that neither MISC nor SFA guaranteed that he would be able to work on the Project for "any period of time."[10] These facts, even when viewed most favorably to Shirvinski, would not establish with the required level of certainty that Shirvinski would have continued in his role on the Project.

---

[9] *See* Fontana Dep., [Doc. No. 191-5] at 89:13-90:4 ("Q. Did you intend to keep Adam Shirvinski in some capacity upon contract renewal? A. I'm not sure when the exact timing of the contract was. There – I was considering an option of not using his services once the CM plan was complete. So that was an option that I was considering, but I don't know how that corresponded to the contract timing right. I don't know if it was before or after, but the point was to get the deliverable of the CM plan. Q. Were you also contemplating having Mr. Shirvinski stay on in Increment 2 to write some CM or some QA functions? A. Yes. I was also considering continuing him for further service.").

[10] Shirvinski Dep., [Doc. No. 177-3] at 78:16-79:5.

**B.      Claims Against the Coast Guard**

In his only claim against the Coast Guard (Count I), Shirvinski asserts a

constitutional tort.  Specifically, Shirvinski alleges that the Coast Guard violated his right

to due process under the Fifth Amendment.  In that regard, Plaintiff claims that the Coast

Guard deprived him of a protected liberty interest by incorrectly stating that Plaintiff

violated the terms of his subcontract, requesting that Shirvinski's contract be terminated,

and by "effectively bar[ring] him from any future Coast Guard contracts and/or

subcontracts," all without first providing him with notice of the allegations against him

and an opportunity to respond. 2d Am. Compl., ¶¶ 99-101.

Shirvinski's constitutional claim is based on the Fifth Amendment's guarantee

that "[n]o person...shall be deprived of life, liberty or property without due process of

law." U.S. CONST. amend. V.  Based on this constitutional protection against government

action, courts have concluded that under certain narrowly defined circumstances, notice

and an opportunity to respond is required in connection with the government's

termination of a person's government related activity through employment or other

contractual arrangements. *See e.g., Old Dominion Dairy Products, Inc. v. Secretary of*

*Defense*, 631 F.2d 953, 968 (D.C. Cir. 1980) (finding contractor had "the right to be

notified of the specific charges concerning the contractor's alleged lack of integrity, so as

to afford the contractor the opportunity to respond to and attempt to persuade the

contracting officer, in whatever time is available, that the allegations are without merit").

The constitutional tort that Shirvinski alleges is narrow in scope and demanding in

its elements.  The elements of this tort have been variously formulated by different

courts, but in substance, the elements are that (1) the government's statements constituted

a charge of a serious character defect, such as dishonesty or immorality; (2) the statements were made in the course of plaintiff's involuntary discharge, demotion or change in legal status by a government actor; (3) the charge of a serious character defect was publicly disclosed; (4) the statements at issue were false; and (5) the government's action formally or automatically excludes the plaintiff from a category of future government contracts or precludes him – whether formally or informally, from such a broad range of opportunities that it interferes with his constitutionally protected right to follow a chosen trade or profession. *See Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 308-13 (4th Cir. 2006); *Stone v. Univ. of Maryland Med. Sys. Corp.*, 855 F.2d 167, 173, fn 5 (4th Cir. 1988); *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995); *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003). Here, the crux of the parties' dispute hinges on whether the Coast Guard effectively directed or caused Shirvinski to be removed from the Project, and whether the Coast Guard's statements about Shirvinski have effectively precluded him from following his chosen profession. Each will be discussed in turn.[11]

---

[11] Although the other elements have not been as much the focus of the parties' briefings, the Court finds that there is a triable issue of fact as to whether the allegedly defamatory statements at issue (in particular, that Shirvinski falsely claimed to be a Coast Guard official) rise to the level of an allegation of a "serious character defect[] such as dishonesty or immorality." *See Ridpath*, 447 F.3d at 308. This Court also finds there is a triable issue of fact as to whether the allegedly defamatory statements were publicly disclosed due to the distribution of the Coast Guard's statements and also whether the alleged statements were false.

1.    **Plaintiff has raised a triable issue of fact as to whether the
      Coast Guard terminated his involvement with the Project.**

The admissible evidence before the Court pertaining to Shirvinski's termination

from the Project is the e-mail on August 13, 2008 from Scott of the Coast Guard to SFA

requesting that SFA take "corrective action;" SFA's letter to MISC that Shirvinski be

removed from the Project, sent within hours of Scott's e-mail; MISC's removal of

Shirvinski from the Project; Lt. Armstrong's August 14 e-mail claiming credit for

causing Shirvinski's removal from the Project;[12] and the Coast Guard's admissions in its

interrogatories that Lt. Armstrong, at Captain Vojvodich's request, in fact asked Lt.

Commander Gero to terminate Shirvinski's work on the Project.[13] None of this evidence

---

[12] On August 14, 2008, in response to an inquiry from Lt. Commander Espino, Lt. Armstrong took credit for causing Shirvinski's separation from the Project. [Doc No. 191-43 (Armstrong: "We should talk tomorrow. Adam is being let go Friday"; Espino: "woah ... someone actually made a decision ... ? what happened ... bah [Booz Allen] called I bet"; Armstrong: "All me. People are spineless in this program. And as of right now I am doing the final firing too.").]

[13] Plaintiff also relies on an unauthenticated e-mail dated August 27, 2009, by Shirley Place, an SFA employee, [Doc. No. 192-11] and also the deposition testimony of MISC executives concerning statements made by the Coast Guard and SFA in order to create an issue of fact concerning whether the Coast Guard ordered Shirvinski's removal from the Project. None of this proffered evidence is admissible and therefore the Court has not considered it in connection with its rulings. As to the e-mail, Place was not deposed and no sworn testimony from her was submitted to the Court through a deposition or affidavit; and the e-mail, even assuming its authenticity, is clearly inadmissible hearsay. *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1991)( "It is well-established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment .... [t]o be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).") (internal punctuation and citations omitted); *see also B&J Enters. v. Giordano*, 329 Fed. Appx. 411, 415 (4th Cir. 2009) (same); *Global Policy Ptnrs, LLC v. Yessin*, 686 F. Supp. 2d 642 (E.D. Va. 2010) (applying *Orsi*). Likewise, Plaintiff's reliance on the deposition testimony from MISC executives Joseph Ryan and Bob Sailsbury regarding conversations with SFA employees Place and a Mr. Olenski is clearly hearsay that cannot be properly considered by the Court. That offered testimony has two hearsay components: (1) the Coast Guard's purported statements to SFA (through Place and Olenski) that the Coast Guard requested that Shirvinski be removed from the Project; and

shows an actual request or direction from the Coast Guard to SFA that Shirvinski be removed from the Project. Nevertheless, based on the entire record (including internal Coast Guard discussions, the circumstances under which Scott sent her e-mail, and SFA's actions in response to that e-mail) the Court finds that there is a genuine issue of material fact concerning whether the Coast Guard acted in a manner that would satisfy Shirvinski's burden to prove that the Coast Guard removed him from the Project.

### 2. Plaintiff has failed to raise a triable issue of fact as to whether he has been effectively barred from following his trade or profession.

Plaintiff concedes that he has not been formally barred from obtaining Coast Guard or other federal contracts. 2d Am. Compl., ¶ 100. Rather, he contends that he has been effectively blacklisted from all government contracts because of the reasons the Coast Guard gave to SFA for his separation from the Project, the Coast Guard's internal record regarding him, and the nature of federal contracting disclosure requirements. This contention, however, is not sufficiently supported by the record.

Courts have made it clear that neither the government's termination of employment or a contractual relationship nor the government's dissemination of negative information about an individual is, in and of itself, sufficient to trigger the protections of the Due Process Clause. *See, e.g., Seigert v. Gilley*, 500 U.S. 226, 234 (1991) (even

---

(2) SFA's statements to MISC (through Ryan and Sailsbury) regarding the former. While the statement from the Coast Guard would qualify as a party admission, *see* Fed. R. Evid. 801(d)(2), the statements from SFA employees would not; and this testimony is not admissible evidence that may be considered to prevent summary judgment. *See* Fed. R. Evid. 805. The Court also rejects Plaintiff's argument that the hearsay statements of SFA's employees are admissible as "present sense impressions" under Fed. R. Evid. 803(1). *See United States v. Manfre*, 368 F.3d 832, 840 (8th Cir. 2004) ("The present-sense-impression exception to the hearsay rule is rightfully limited to statements made while a declarant perceives an event or immediately after, and we decline to expand it to cover a declarant's relatively recent memories.").

where statements in a recommendation from a prior government employer "would undoubtedly ... impair his future employment prospects" they are not an actionable constitutional violation "so long as such damage flows from injury caused by the defendant to a plaintiff's reputation" alone); *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994) ("action which inflicts a stigma on the reputation of a plaintiff causing that plaintiff hardship in obtaining employment is harm to reputation that does not rise to the level of a constitutional deprivation"). Likewise, defamatory statements do not necessarily give rise to a constitutional claim. *Seigert*, 500 U.S. at 234. Rather, "plaintiffs must show not only that the government harmed their reputation, but also that the resulting stigma altered [their] status in a tangible way." *Trifax Corp*, 314 F.3d at 644 (internal punctuation omitted); *see also Taylor*, 56 F.3d at 1506 (analyzing *Paul v. Davis*, 424 U.S. 693, 711-12 (1976)). These types of "reputation plus" cases require "harms approaching, in terms of practical effect, formal exclusion from a chosen trade or profession." *Trifax Corp.*, 314 F.3d at 644. In order to satisfy this standard, plaintiffs must prove that "the government has seriously affected, if not destroyed, [their] ability to obtain employment [or contracts] in [their] field." *Id.* (internal punctuation omitted).

The record indicates that since his separation from the Project, Shirvinski has unsuccessfully attempted to obtain additional work in his field through three other contractors. As a result of these efforts, he was invited to attend at least one invitation only job fair sponsored by a federally funded development corporation (The MITRE Corporation) that supports federal agencies, including the Department of Defense and Department of Homeland Security. However, there is no evidence that Plaintiff's lack of success with respect to these job opportunities had anything to do with his removal from

the Project or any statements made about him. In fact, the record also contains testimony from another government contractor that supports agencies in the security and defense area (URS Corporation), which testified at deposition through a retired Coast Guard Rear Admiral that the circumstances of Plaintiff's separation from the Project would not bar Plaintiff from working on future Coast Guard projects. In fact, in a bid proposal for a Coast Guard project, URS identified the Plaintiff as the member of the team who would provide CM services; and though URS's proposal was not selected, there is no evidence that URS's intention to use Shirvinski was responsible for URS's lack of success in obtaining the contract.

Shirvinski also contends that his removal effectively barred him from obtaining Coast Guard or other federal contracts, even though he has not been formally barred, because Coast Guard contract certification provisions require any contract proposal that includes Shirvinski as a person providing services to the Coast Guard to disclose that Shirvinski had been removed from the Project. In this regard, Shirvinski testified that, as a result of these certification requirements, he "withdrew himself from consideration" with one contractor, URS, because his participation "would have made URS unable" to certify that "none of their employees and/or sub-contractors were previously terminated for misconduct." *See* Shirvinski Dec. [Doc. No. 191-3], ¶ 30. Shirvinski's subjective belief, however, that he is not hirable or that he would taint those who associate with him is not sufficient. First, as noted above, URS's designated representative, a retired Coast Guard Rear Admiral, did not view Mr. Shirvinski's termination as a bar against future Coast Guard projects. Second, the Coast Guard has provided an unrebutted sworn affidavit from Patricia Williams, Chief of Formal Contracts Division I of the United

States Coast Guard, in which she unequivocally states that "[t]he Coast Guard would not consider the circumstances by which Mr. Shirvinski's work as a subcontractor-consultant with CG9 [the Project] ended as an impediment to his obtaining work – as either a prime or a subcontractor – on other Coast Guard work in the future." Williams Dec., [Doc. No. 181-5, at pp. 12-13] ¶¶ 3-4 (stating also that Ms. Williams reviewed both the Coast Guard's Excluded Parties List System which contains public information about debarred contractors, and the Coast Guard's Past Performance Information Retrieval System, and that she "could find no mention of Mr. Shirvinski in either database").

For the above reasons, the Court finds and concludes that Shirvinski has failed to present evidence sufficient for a reasonable fact finder to conclude that he is effectively barred from pursuing his chosen trade or profession as a result of his removal from the Project or the statements made about him; and his claim against the Coast Guard must be dismissed as a matter of law.

## Conclusion

For the above reasons, the Motions for Summary Judgment filed by Defendants Booz Allen Hamilton Inc. and the United States Coast Guard [Doc. Nos. 176 and 179] will be granted and the case will be dismissed with a Final Judgment Order entered in their favor.

An appropriate Order will follow.

_____/s/_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
October 25, 2010